IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

ROSITA LOPEZ,                       )
                                    )
        Plaintiff,              )
                                    )
vs.                                 )   Case No. 11-1101-CV-SJ-ODS
                                    )
DLORAH, INC. d/b/a NATIONAL         )
AMERICAN UNIVERSITY,                )
                                    )
        Defendant.              )

<u>ORDER AND OPINION GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

<u>I.  BACKGROUND</u>[1]

<u>A.  General</u>

      Defendant is a South Dakota corporation engaged in the business of providing higher education classes and degree programs for profit at various locations around the United States.  Plaintiff is a Kansas citizen and resident who enrolled in Defendant's Paralegal Studies program in May 2005 and began classes in June 2005.  She signed an Application for Admission on May 16, 2005, and executed a Promissory Note to cover her fees and tuition on May 18, 2005.  These events occurred in Kansas.  At the time she was attending classes, Plaintiff also held jobs in the immigration field.  Her

---

[1]The parties substantially agree on the material facts, so citations to the Record are supplied only where there is disagreement.  Both sides present facts that are not material to the legal issues involved or have interjected arguments about the facts; consistent with the standard for summary judgment motions the Court has not detailed all of them.  Consistent with the standard for summary judgment motions, all facts are stated in the light most favorable to Plaintiff.

stated career goal was to continue work in that field, and she believed a paralegal degree would help in that endeavor.

A letter from Tunya Carr (the Executive Director of Defendant's Overland Park, Kansas, campus) confirmed receipt of the Application for Admission and advised Plaintiff her application had been accepted. Plaintiff's "home campus" was the Overland Park campus, and she completed ten classes at that location. She took another five classes online; in total, she completed seventeen classes before withdrawing on May 17, 2007. This constituted all the classes she needed to complete the program; the only missing requirement was an internship.

## B. ABA Certification

The American Bar Association ("ABA") will certify paralegal education programs, but an educational institution is not required to obtain certification before bestowing paralegal degrees. Defendant's program in the Kansas City area was not certified. The topic was not discussed with Plaintiff when she initially enrolled. Plaintiff's Dep. I at 57. During the first quarter of her enrollment, the Regional Director of Legal Studies (Chuck Wolfe) discussed Defendant's efforts to obtain ABA certification. According to Plaintiff, Wolfe and an instructor (Deborah Benton) discussed the importance and value of ABA certification. Wolfe discussed the fact that NAU was seeking certification, but Plaintiff testified Wolfe also discussed what would happen if certification was not obtained before Plaintiff graduated. Plaintiff's Dep. I at 65-66.

According to Plaintiff, the prospects for ABA certification became important to her once she learned what it was and she heard from Wolfe and Benton about the value of such certification. In November 2006, Plaintiff (as Defendant phrases it) "began to question whether NAU's Kansas City paralegal program would become ABA approved." The results of these inquiries are not specified by the parties, but Plaintiff remained enrolled through May 2007. There is a factual dispute as to whether the issue of ABA certification was a material to Plaintiff's decision to remain enrolled. The uncontroverted facts demonstrate NAU was actually trying to obtain ABA approval. Although it did not

2

submit an application in either 2006 or 2007, Defendant was taking steps necessary to the eventual submission of an application.

### C. Internship Opportunities

One of the requirements for completing the paralegal program was participation in an internship. Wolfe told Plaintiff that Defendant would assist her in locating the required internship, and toward the end of her enrollment Plaintiff sought this assistance. Plaintiff's Dep. I at 101-02. At the time, Plaintiff was working four days a week, which limited her availability for an internship. Benton referred Plaintiff to two or three people for possible internships. Id. at 106-07. Wolfe provided one contact. Id. at 107. Other individuals provided contacts on Defendant's behalf, and other indvidiuals expressed willingness to provide assistance. E.g., Plaintiff's Dep. I at 113-21; Plaintiff's Response to Defendant's Statement of Fact 31.

### D. Transfer of Credits

During her deposition, Plaintiff testified that in May 2006 Wolfe told her that credits would transfer to Avila College and Johnson County Community College ("JCCC"). She did not describe Wolfe as stating that all credits would transfer; instead, she described Wolfe's statement as indicating "there was an agreement between Johnson County Community College and NAU for transfer of credits." Plaintiff's Dep. I at 144. In truth, however, not all credits would transfer. Plaintiff testified she spoke with Anita Tebbe, an admission official at JCCC, and was told she would need fourteen more hours to complete JCCC's program even though she had already completed Defendant's program. Plaintiff also testified that she did not apply to JCCC and never testified she actually wanted to transfer to JCCC; she initiated the conversation "only to see what would happen if I went ahead and . . . applied and enrolled for the paralegal program there." Plaintiff did not contact Avila or any other institution to see if the credits would transfer. In reality, there is an agreement between JCCC and Defendant regarding the transfer of credits; its details need not be recited here.

3

### E. Other Misrepresentations

During enrollment, Plaintiff toured the computer lab and was told the computers were available for student use. However, while she was enrolled "[h]alf the time they weren't working." Plaintiff's Dep. I at 58.

Before enrolling, Plaintiff was told some classes would have to be taken at different area campuses or online. In addition, the undergraduate catalog advised that class schedules were subject to change. Plaintiff testified that Barbara Sales (an admissions representative) told her an introductory class would have to be taken at Defendant's Zona Rosa location in Kansas City, Missouri because it was not being offered at the Overland Park campus in Summer 2005. Plaintiff was told that she would be behind if she delayed taking the class, so she enrolled in the class at Zona Rosa even though it was significantly further from her house than the Overland Park campus. Later, Plaintiff found out the class was offered at Overland Park in Fall 2005. Plaintiff testified that if she had known the class was offered in the Fall of 2005 at Overland Park she would have delayed enrolling to avoid taking the class at Zona Rosa. She also testified that she asked about delaying enrollment to the Fall of 2005, but was told the class would not be taught at the Overland Park campus that semester either.

Plaintiff asked where she could buy books, and she was referred to Defendant's bookstore. In written documents she characterizes this discussion as misleading her into believing that was the only place she could purchase books, but her description of the discussion's content belies this claim. She asked where she could buy books, and she was told she could buy them at the bookstore. She does not claim she was told this was the only place she could buy them, although that is how she interpreted the statements.

### F. Omissions Regarding Loan Defaults

Plaintiff alleges Defendant failed to disclose that a significant number of students had defaulted on their federal loans, and this fact was material to her decision to enroll. However, in her deposition she could not specify a number that constituted "significant,"

4

did not know what the default rate was, did not know what an acceptable default rate would be, and did not even know what the term "default rate" means. Plaintiff also did not ask anyone what the loan default rate was for Defendant's students. Plaintiff attended other institutions of higher learning before and after attending NAU and did not ask questions about the default rate; in fact, Plaintiff did not decide this information was important to her until late 2011 or 2012. Plaintiff's Dep. II at 46-53.[2] Finally, the Department of Education maintains information about student loan default rates for institutions of higher learning on a publicly available website; Defendant's student loan default rates for the relevant time period were within a range considered acceptable by the Department of Education.

### G. Omissions Regarding Financial Incentives for Admission Representatives

Plaintiff alleges she was not told that the admissions representatives were commissioned or otherwise received benefits based on the number of students enrolled. Moreover, she was not told anything about compensation for admissions representatives. Plaintiff has attended other institutions of higher learning both before and after her enrollment at NAU, and never asked questions about the compensation arrangements for admissions personnel. Plaintiff did not decide that compensation was important to her until late 2011 or 2012.

---

[2]To the extent Plaintiff asserts a claim of attorney/client privilege, the claim is rejected. Apparently, Plaintiff decided this information was important after talking to her attorney – but the question in the deposition did not ask Plaintiff for the content of any statements from counsel, and for that matter did not ask Plaintiff anything that required Plaintiff to identify counsel as the source for her increased interest in the matter. The conversation with counsel serves as an event that helped Plaintiff recall the date, but this does not make the date privileged. The Court states it is not placing any reliance on the possibility that Plaintiff's increased interest in this subject is attributable to a conversation with her lawyer.

### H.  Omissions Regarding Employment Statistics

Plaintiff alleges Defendant failed to disclose the most recent employment statistics or divulge that "many" paralegal graduates failed to obtain employment after completing Defendant's paralegal program.  Plaintiff did not ask for any such information, and did not know what an acceptable rate of employment/placement would have been.  Defendant's paralegal program in the Kansas City area was relatively new, and at the time of Plaintiff's enrollment only one student had graduated with an associate's degree in paralegal studies.

### II.  DISCUSSION

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986).  "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Wierman v. Casey's Gen. Stores, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).  However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

6

The Amended Complaint asserts the following claims:

| | |
|---|---|
| Count I | Fraudulent Misrepresentation |
| Count II | Fraudulent Concealment/Omission |
| Count III | Violation of the Missouri Merchandising Practices Act |
| Count IV | A request for injunctive relief as permitted by the Missouri Merchandising Practices Act |
| Count V | Breach of Contract |
| Count VI | Negligence |
| Count VII | Negligence Per Se |

Both parties address the claims in an order different from the order they are presented in the First Amended Complaint. In fact, their briefs address the issues in an order different from each other. The Court's Order will follow the sequence employed in Defendant's Suggestions in Support.

## A. Breach of Contract

Count V alleges the Application for Admission combined with Defendant's acceptance of that application constituted a contract, and further alleges Defendant breached that contract by failing to provide adequate materials and instruction and failing to provide the curriculum promised. In seeking summary judgment, Defendant argues (1) Kansas law governs, (2) there is no contract, and (3) even if there is a contract, there was no breach. Plaintiff seems to agree that Kansas law applies, and purely for the sake of argument the Court will accept Plaintiff's assertion that a contract exists. The problem is Plaintiff's inability to demonstrate any evidence of a breach.

In response to Defendant's arguments, Plaintiff has abandoned the breaches alleged in Count V of her Amended Complaint and argues Defendant breached the contract because "it was reasonably expected that NAU would submit an application to [the] ABA for approval of its paralegal program" and Defendant's failure to do so violated the covenant of good faith. Plaintiff's Suggestions in Opposition at 80-81. This

7

argument fails for four reasons.  First, this is not the theory pleaded in Count V.[3]  Second, the statements made about the ABA program were made after Plaintiff and Defendant entered the contract posited by Plaintiff, so they could not have created a contractual requirement.  Third, there is nothing in the documents forming the posited contract (the Application for Admission or Defendant's responsive letter) related to ABA certification.  Plaintiff relies upon the covenant of good faith and fair dealing to "import" or create a contractual obligation, but this asks too much of the doctrine.  The covenant of good faith and fair dealing considers the parties' expectations when evaluating the propriety of a discretionary decision specifically contemplated by the contract.  E.g., CIT Group/Sales Financing, Inc. v. E-Z Pay Used Cars, Inc., 32 P.3d 1197, 1202 (Kan. Ct. App. 2001).  The parties' reasonable expectations are determined objectively, id., and objectively, there were no expectations about ABA certification at the time the parties contracted.  The covenant of good faith and fair dealing cannot be relied upon to add terms to a contract that do not exist, or to address topics upon which the written contract is completely silent.  Finally, and most importantly, the uncontroverted facts demonstrate Defendant was pursuing ABA certification, so any provision requiring Defendant to pursue certification would not have been breached.  Defendant is entitled to summary judgment on Count V.

## B.  Missouri Merchandising Practices Act

The Missouri Merchandising Practices Act ("MMPA") prohibits the use of "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri . . . ."  Mo. Rev. Stat. § 407.020.1.  The reference to "in or from the state of Missouri" means "the trade or commerce [must] originate or occur 'in or from the state of

---

[3]The Amended Complaint asserts "Defendant failed to provide Plaintiff with adequate materials and instruction, and failed to provide the curriculum they represented, and in doing so breached" the contract.  Amended Complaint, ¶ 67.  Plaintiff's deposition testimony demonstrates Defendant did not fail in these respects.

8

Missouri.'" State ex rel. Nixon v. Estes, 108 S.W.3d 795, 800 (Mo. Ct. App. 2003). Thus, in Estes the MMPA applied to conduct occurring in or originating from Missouri even though the consumers/plaintiffs in question were from other states. This also means that conduct originating outside Missouri that affects Missouri consumers is actionable. However, in this case, Plaintiff – a Kansas citizen – raises claims about conduct that occurred in Kansas. Her claims do not involve any conduct "in or from the state of Missouri," so the MMPA does not apply.

Plaintiff argues Defendant has engaged in a "pattern and practice" of fraud and other improper conduct designed to lure students to enroll at its schools in the Kansas City metropolitan area. A "pattern practice" allegation is not a magic talisman that can obscure the substance of Plaintiff's claims. Plaintiff met with Defendant's agents in Kansas, enrolled in Kansas, designated a location in Kansas as her home campus, attended ten classes at the Kansas campus and another five online (presumably from her home in Kansas). Plaintiff does not allege that any of the specific acts of misconduct that she is suing over occurred in Missouri. She does allege that there are advertisements on television and elsewhere, and alleges that Defendant's "deceptive and unfair scheme occurs in *both* Missouri *and* Kansas," but Plaintiff's claims are limited to those asserted in her Amended Complaint – and those claims did not occur in or originate from Missouri. Defendant is entitled to summary judgment on Counts III and IV.[4]

## C. Fraudulent Misrepresentation[5]

Count I asserts a claim for fraudulent misrepresentation. The Court construes Count VI as asserting a claim for negligent misrepresentation. The parties do not agree (but then, neither do they specifically disagree) as to whether Missouri or Kansas law

---

[4]Plaintiff's MMPA claim is based on other allegations in the First Amended Complaint. As an alternative holding, Counts III and IV fail for the same reasons discussed in the context of those other claims.

[5]The Court's ruling should not be construed as expressing an opinion as to any of Defendant's other arguments, including specifically its claims regarding the materiality of the representations at issue.

9

governs this dispute. The Court is obligated to apply Missouri's choice of law rules, e.g., Dorman v. Emerson Elec. Co., 23 F.3d 1354, 1358 (8th Cir. 1994), and in tort cases Missouri employs the most significant relationship test. E.g., Pony Computer, Inc. v. Equus Computer Sys. Of Mo., Inc., 163 F.3d 991, 995 (8th Cir. 1998). This requires the Court to consider "(1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered." American Gaurantee & Liability Ins. Co v. United States Fidelity & Guaranty Co., 668 F.3d 991, 996 (8th Cir. 2012). Here, all of these factors point to Kansas. Plaintiff's "home campus" was in Kansas, and she took nearly all of her classes there. Plaintiff is a citizen of Kansas; Defendant does business in both Kansas and Missouri but is not incorporated in either location and does not have its principal place of business in either state. Most of the statements (and all of the omissions) occurred in Kansas, and most of the omissions allegedly occurred at the time Plaintiff submitted her Application for Admission in Kansas. Any injury suffered by Plaintiff was experienced in Kansas. Based on the near-unanimity of factors, the Court concludes Plaintiff's common law tort claims (Counts I, II, VI and VII) are governed by Kansas law.

"Fraudulent misrepresentation involves an untrue statement of material fact, known to be untrue, made with the intent to deceive or with reckless disregard for the truth, and upon which another party justifiably relies to his or her detriment." Smith v. Stephens, 940 P.2d 68, 69 (Kan. Ct. App. 1997). Negligent misrepresentation differs from fraudulent misrepresentation in that the plaintiff need only prove the defendant failed to act with reasonable care to communicate accurate information. Gerhardt v. Harris, 934 P.2d 976, 984 (Kan. 1997); Mahler v. Keenan Real Estate, Inc., 876 P.2d 609, 604-05 (Kan. 1994). As relevant to this case, this means that a negligent misrepresentation must, at a minimum, involve an untrue statement of material fact.

Plaintiff posits a variety of statements she alleges support her claims for fraudulent and negligent misrepresentation. Part of the difficulty in considering her claims is that neither party has been particularly specific about what was actually said. The parties describe the statements, and Plaintiff further describes how she interpreted

10

statements, but the Record often does not conclusively establish exactly what was said. Given that this is a motion for summary judgment, the Court must construe the alleged statements in Plaintiff's favor – but even when this is done, the statements will not support her misrepresentation claims.

### 1. ABA Accreditation

Defendant argues any misrepresentations about ABA accreditation are not actionable because the statements involved predictions of future actions of a third party. Plaintiff agrees, but argues her claim is premised on the statement that Defendant would seek ABA approval – a representation she alleges was false because Defendant never sought ABA approval.  However, the uncontroverted facts demonstrate that the statement was true when it was made: Defendant intended to seek ABA certification, and Wolfe was working on this effort.  Defendant did not formally apply in 2006 or 2007, and there is no indication as to whether Defendant ever formally applied – but this is not the issue.  There was no ironclad promise the application would be completed at any particular time.  To the contrary, Plaintiff testified that Wolfe addressed the possibility that the process would not be completed before Plaintiff graduated.  The issue is: when statements were made about Defendant's intent to apply for ABA certification, where those statements true?  The answer is yes, because the Record demonstrates Defendant intended to seek certification and Defendant commenced the necessary steps to apply.

### 2. Internship Assistance

Defendant argues that no false statement was made regarding internship assistance.  Plaintiff was told she would receive assistance, and the facts demonstrate she received five referrals and declined an offer of further assistance.  Plaintiff does not specifically respond to Defendant's legal argument.  At the same time she admitted the preceding facts, Plaintiff argued (1) Wolfe did not personally provide assistance and (2) Plaintiff had to ask for assistance.  Even if these points are correct, they do not

11

demonstrate the falsity of Wolfe's statements. Plaintiff does not allege she was told that Wolfe would personally provide assistance, nor does she allege that Wolfe represented assistance would come without any initiation from Plaintiff. The Record demonstrates Plaintiff was provided assistance, so no false statement was made.

### 3. Credit Transfers

Defendant contends Wolfe's statements were true: credits from Defendant's paralegal program would transfer to JCCC. He did not say they would transfer one-for-one; he merely said there was an agreement in place.[6] Plaintiff does not respond to this argument specifically, nor does she identify anything in Wolfe's statement that would suggest the credits would transfer on a one-for-one basis.

The Record also establishes that Plaintiff did not rely on any representations regarding transferability of credits. She does not even state this was an important fact to her, and her actions demonstrate otherwise. In particular, she never considered transferring to JCCC. She "tested" the transferability of credits after she left Defendant's program, but indicated she did not really plan to enroll at JCCC. On this Record, the transferability of credits was not a fact relied upon by Plaintiff to remain enrolled in Defendant's program.

### 4. Other Issues Related to Misrepresentations

Plaintiff addresses the factual underpinnings of additional alleged misrepresentations, but does not discuss the legal viability of these claims. Arguably, she has abandoned them. Nonetheless, the Court has grouped these matters under this single heading and now rejects them on the merits.

---

[6]The Court rejects Defendant's argument that it is entitled to judgment because Wolfe did not "specif[y] in which direction" credits would transfer. The Court believes that a statement to prospective or current students that credits granted by the school will transfer necessarily conveys the idea that they will transfer *from* the school *to* another one.

12

Plaintiff's claim that the availability of computers was misrepresented is not actionable. Accepting Plaintiff's assertion that the computers were frequently unavailable does not make the Defendant's statement that computers were available an actionable misrepresentation. Electronic devices break down, often unexpectedly. This did not transform earlier representations that computers were available into false statements.

Plaintiff's claim about the availability of books for purchase also is not actionable. She alleges she asked where she could buy books. She alleges she was told she could buy them at the school's bookstore. She does not allege she was told she was required to buy them at the school's bookstore, nor does she allege she was told she could not buy them elsewhere. Defendant's statement was true: Plaintiff could buy the books she needed at the school's bookstore. Plaintiff's misinterpretation of accurate information does not render the statements false. Defendant was not required to tell Plaintiff all the other places in the world where she could purchase books.

Finally, Plaintiff's claim regarding the availability of the first class at the Overland Park campus is not actionable. Plaintiff claims she was told the class was not available at Overland Park in the Summer of 2005. This was true. Plaintiff was told that if she waited to take the class she would fall behind. This was true; Plaintiff conceded the class in question was a prerequisite for all other classes. Plaintiff was told the class would not be offered at Overland Park in the Fall of 2005. However, Plaintiff was told that class schedules were subject to changed. Plaintiff's claim can succeed only if Sales' statement that the class was unavailable in the Fall of 2005 was false when it was made in May – but Plaintiff does not even make this assertion. All Plaintiff alleges is that some student told her he took the class at Overland Park in the Fall 2005 semester. Assuming this statement is true, it does not establish the falsity of the statement made in May 2005.

13

## D. Concealment/Omission[7]

Fraudulent concealment (or fraud by silence) has the following elements under Kansas law:

1. Defendant's knowledge of material facts which "plaintiff did not have and which plaintiff could not have discovered by the exercise of reasonable diligence;"
2. Defendant had an obligation to disclose the material facts to the plaintiff;
3. Defendant intentionally failed to communicate the material facts;
4. Plaintiff justifiably relies on the defendant to communicate the facts; and
5. Plaintiff sustains damages.

Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman, 978 P.2d 922, 932 (Kan. 1999).[8]

A duty to speak can arises in several circumstances. Defendant has gone to great lengths to demonstrate that there was no statutory requirement that it reveal the facts at issue, and Plaintiff has not disputed this analysis. Instead, Plaintiff relies on a passage from Boegel v. Colorado Nat'l Bank of Denver holding that a duty to speak arises if one party knows the other party is entering into a transaction while laboring under a mistake as to the facts and the custom in the industry calls for disclosure of such facts. 857 P.2d 1362, 1365 (Kan. Ct. App. 1993). A fact is material if it is one "'to which a reasonable man would attach importance in determining his choice of action in the transaction in question.'" York v. InTrust Bank, N.A., 962 P.2d 405, 420 (Kan. 1998) (quoting Girffith v. Byers Construction Co., 510 P.2d 198, 205 (Kan. 1973)). With these principles in mind, the Court will analyze each of the omissions Plaintiff has advanced.

---

[7]The Court's discussion should not be construed as expressing an opinion on any of the parties' other arguments, including their arguments regarding the statute of limitations.

[8]The parties dispute whether Kansas recognizes a cause of action for "negligent concealment," but the Court discerns no need to resolve the issue. The only difference between "fraudulent concealment" and "negligent concealment" is whether the defendant acts intentionally. Plaintiff's concealment claims fail for unrelated reasons, so it does not matter if negligent concealment is a viable cause of action.

### 1. Compensation for Admissions and Other Personnel

Plaintiff alleges she was not told that the number of students enrolled played a part in compensating admissions and other personnel. While the Court does not agree that all of the items identified constitute "compensation," (e.g., celebratory lunches and the bestowing of certificates), the Court agrees that the Record – construed in the light most favorable to Plaintiff – demonstrates that recruitment or enrollment rates were a factor in determining raises and other compensation-related decisions.

The Court holds this fact is not material as a matter of law. All people who work are compensated. More specifically, all people who work in the admission department at institutions of higher learning – both for-profit and not-for-profit institutions – are compensated. All individuals – including admissions personnel – are presumably rewarded when the enterprise is successful, and are presumably subject to repercussions if they do a poor job. A reasonable person would not ordinarily attach importance to the details of the compensation formulas for the agent with whom he or she transacts, and the same holds true in this context. It may be that as a matter of public policy various statutes or regulations limit the nature of an admission representative's compensation. This does not transform the subject into one that is material and thus must be disclosed.

### 2. Other Alleged Omissions

Plaintiff addresses the factual underpinnings of additional alleged omissions, but does not discuss the legal viability of these claims. Arguably, she has abandoned them. Nonetheless, the Court has grouped these matters under this single heading and now rejects them on the merits.

Plaintiff asserts Defendant did not disclose the loan default rate for its students. The Court discerns no duty to disclose such information. The uncontroverted facts demonstrate the loan default rate for Defendant's students was within the "normal" range, and Plaintiff proffers no legal requirement that Defendant disclose such

15

information.  Second, the information was available from the Department of Education's website, so Plaintiff could have discovered the information through reasonable diligence if she wanted to.  Finally, there is nothing in the Record to suggest the information was material.  None of the elements for this cause of action are satisfied by this omission.

Plaintiff also asserts Defendant did not disclose the job placement rates for graduates from the paralegal program.  As a general proposition, the program was new, so any information would not have been material.  More specifically, Plaintiff was pursuing this degree to further her then-current career.  She was not planning to become a new entrant in the workforce; she was planning to increase her prospects in a career she had already started.  Thus, information about how those entering the work force fared was immaterial to Plaintiff's decisionmaking process.  Once again, none of the elements are satisfied.

### E.  Negligence Per Se

Count VII asserts a claim for negligence per se.  Specifically, Plaintiff alleges Defendant had a statutory/regulatory duty to refrain from making false or deceptive statements or concealing material facts.  Amended Complaint, ¶ 79.  Plaintiff further alleges Defendant was subject to various other state and federal statutes and regulations.  Amended Complaint, ¶ 80.  Plaintiff then alleges Defendant violated the statutes and regulations "by making false, deceptive, erroneous or misleading statements to Plaintiff, and/or by omitting or concealing information or making statements that cannot be verified by Defendant."  Amended Complaint, ¶ 81.

The Amended Complaint does *not* allege that Defendant committed negligence per se by violating statutes and regulations regarding the payment of admissions personnel.  Plaintiff also has not asserted this theory in its response to Defendant's Motion for Summary Judgment.  The Court's preliminary review of the law suggests the claim would not be viable under Kansas law.  See Pullen v. West, 92 P.3d 584, 593-97 (Kan. 2004).  For these reasons, there is no need for the Court to discuss whether Defendant's compensation plan violates the law.

16

Count VII provides nothing that other claims in this case do not. Just as with the other claims, in order to succeed on this claim Plaintiff will have to demonstrate Defendant made material misrepresentations or omissions. The other claims are predicated on common law and Count VII is predicated on a variety of statutes and regulations, but the governing legal principles are the same. As stated earlier, the Record establishes that Defendant did not make any misrepresentations and did not conceal any material facts. Accordingly, Defendant is entitled to judgment on Count VII .

### III.  CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. # 97) is granted.

IT IS SO ORDERED.

DATE: September 17, 2012

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT